UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DAVID E. ERNST, | ) |
|     Plaintiff, | ) ) ) |
| v. | ) ) Cause No. 4:20-cv-01239-SEP |
| TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, | ) ) ) ) ) |
|     Defendant. | ) ) |

**MEMORANDUM AND ORDER**

Before the Court is Defendant Teachers Insurance and Annuity Association of America's (TIAA) Motion for Summary Judgment, Doc. [42], on all counts of Plaintiff David E. Ernst's Amended Complaint. For the reasons set forth below, the motion is granted.

**FACTS AND BACKGROUND**[1]

This case asks whether TIAA discriminated against Ernst in violation of the Age Discrimination in Employment Act (ADEA), Title VII of the Civil Rights Act of 1964 (Title VII), and the Missouri Human Rights Act (MHRA) when it terminated Ernst's employment.

TIAA is a financial services organization and pension provider for professionals in education, research, and related fields. Doc. [43] ¶ 1. TIAA employed Plaintiff, who is male and was born in 1954, as a Wealth Management Advisor (WMA) from January 2012 until July 2019. *Id.* ¶ 3. WMAs act as primary relationship managers for TIAA's individual clients. *Id.* ¶ 4. During his employment, Plaintiff reported to Wealth Management Directors Chris Pearo (male, born in 1976), and Byron Blaine (male, born in 1973), who in turn reported to Jarrod Fowler (male, born in 1971), the Regional Managing Director. *Id.* ¶ 5. During the relevant period, WMAs were evaluated by considering both quantitative and qualitative factors.[2] *Id.* ¶¶ 6, 11. WMA's quantitative performance

---

[1] Except as otherwise noted, the facts in this section are not disputed. The facts are taken from Defendant's Statement of Uncontroverted Material Facts and Exhibits, Plaintiff's response to the same, and Defendant's reply. *See* Docs. [43], [43-1] through [43-34], [50], [50-1] through [50-40], and [58]. In its discussion below, the Court may cite further portions of the record as necessary to address the parties' arguments.

[2] Plaintiff denies that WMAs were evaluated using both quantitative *and* qualitative factors; his sole record cite in support of that denial is his own affidavit, Doc. [50-6], in which he attests that "[d]uring [his] tenure, there

1

was measured against a scorecard, which compiled and weighed a variety of factors, placing particular emphasis on meeting external asset growth (EAG)[3] goals. *Id.* ¶¶ 6-8. WMAs were assigned personal EAG goals, based on tenure and prior year goals, by the TIAA Wealth Management Business Management Office, Wealth Management Directors, and Regional Managing Directors. *Id.* ¶ 9. The quantitative scorecard was part of a larger overall performance review process, and each WMA was also evaluated on a variety of qualitative factors, including coaching, demonstrating TIAA values (putting clients first, taking personal accountability, acting with integrity, delivering excellence, and valuing TIAA people), whether the WMA had been placed on a performance improvement plan, and whether the WMA held sufficient and effective planning meetings. *Id.* ¶¶ 6, 11.

Managers in the Wealth Management Department met quarterly with Human Resources employees to review the performance of WMAs. *Id.* ¶ 14. Those "calibration meetings" happened regionally and then nationally, and prior to the meetings, Wealth Management Directors would submit recommendations for performance management and discipline to their Regional Managing Directors. *Id.* ¶ 16. WMAs could be disciplined for various reasons, including deficiencies in qualitative and quantitative performance metrics, and the disciplinary process normally progressed from informal coaching to the implementation of a "collaborative coaching plan,"[4] followed by

---

was never a focus on 'qualitative' measures" and that "the focus was based upon the numbers" instead. *Id.* ¶ 20. But in his deposition, Plaintiff acknowledged that WMAs were judged by qualitative measures and that both his evaluations and his written warning focused in part on qualitative elements of his performance. Doc. [43-4] 145:17-147:2; *see Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 498-99 (8th Cir. 2008) (while courts must generally consider an admissible affidavit, it need not if such affidavit contradicts previous deposition testimony); *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983) ("A party should not be allowed to create issues of credibility by contradicting his own earlier testimony."). In addition, multiple Exhibits to the Statement of Material Facts establish that TIAA evaluated WMAs on qualitative factors. *See* Docs. [43-4]; [43-16]-[43-25]; [43-27]; [43-29]; [43-30]. And in any event, the mere fact that Plaintiff did not believe qualitative measures were a "focus" at TIAA does not controvert the allegation that "TIAA evaluated WMAs qualitatively through performance reviews," and considered "factors such as coaching and demonstrating TIAA values." Doc. [43] ¶¶ 6, 11.

[3] EAG occurs "when a client brings new assets to TIAA or begins using products or solutions with TIAA," and TIAA leadership emphasized meeting EAG goals. Doc. [43] ¶¶ 7-8.

[4] In 2017, TIAA ceased using performance improvement plans and began using collaborative coaching plans, which are described as "similar to a performance improvement plan but less formal in structure and tone." *Id.* ¶ 13. A collaborative coaching plan would be completed by a WMA together with his manager to address performance gaps. *Id.*

2

verbal or written warnings. *Id.* ¶ 12.[5] At the quarterly meetings, participants would focus on WMAs in the bottom 20% of the scorecard ranking, as well as WMAs who had previously been on discipline, and would compare them to WMAs in the same advisor hire class. *Id.* ¶ 16. TIAA did not discipline every WMA in the bottom 20%, however, and it did discipline WMAs ranked above the bottom 20% who had qualitative performance issues. *Id.* ¶ 17.[6] For example, WMAs who did not demonstrate TIAA values or were resistant to coaching were subject to discipline, up to and including termination, regardless of their quantitative performance. *Id.* ¶ 19. Beginning in 2019, TIAA revised the scorecard for WMAs to explicitly state that quantitative and qualitative measures would each count for 50% of the total scorecard. *Id.* ¶ 18.

Plaintiff has a history of performance issues at TIAA. *Id.* ¶¶ 22-48. In April 2016, after Ernst met only 15.03% of his year-to-date EAG goal, his direct manager, Chris Pearo, placed Ernst on a performance improvement plan (PIP). *Id.* ¶ 23.[7] In July and October of 2016, Pearo extended Plaintiff's PIP because he was still behind his year-to-date EAG goal. *Id.* ¶ 24. Plaintiff ended 2016 at 78% of his EAG goal. *Id.* ¶ 26. Plaintiff received a "needs improvement" rating in his 2016 performance review, and Plaintiff acknowledged that he was not pleased with his EAG results. *Id.* ¶ 25. His 2017 performance review showed a "solid" rating, and he ended the year having achieved 83.3% of his EAG goal. *Id.* ¶ 28. Still, by April 2018, he had fallen far behind on his EAG

---

[5] Plaintiff denies these facts but offers nothing to controvert them. He criticizes the TIAA disciplinary process as "highly subjective," and complains that there are no written guidelines or policies addressing when or how to utilize disciplinary measures. *See* Doc. [58] at 8. But Plaintiff cites no evidence refuting TIAA's allegations that WMAs could be disciplined for qualitative or qualitative reasons or its descriptions of the types of discipline generally used. Federal Rule of Civil Procedure 56(c)(1) provides that a party asserting that a fact "is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . . ." As Plaintiff does not support his denial of these facts with citation to any material from the record that actually controverts the same, the information is deemed admitted. *See Jones v. United Parcel Serv., Inc.,* 461 F.3d 982, 991 (8th Cir. 2006) (district court properly deemed facts admitted that were not properly controverted); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may (2) consider the fact undisputed for purposes of the motion."). In any event, the arguments offered by Plaintiff are immaterial, as "the presence of subjectivity in employment evaluations is itself not a ground for challenging those evaluations as discriminatory." *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1014, 1019 (E.D. Mo. 2017). In fact, a "supervisor's assessment of a particular employee's performance is necessarily subjective." *Hilt v. St. Jude Med. S.C., Inc.*, 687 F.3d 375, 381 (E.D. Mo. 2012).

[6] Plaintiff denies this statement on the same grounds as he denied ¶ 12, and his objections fail for the same reasons. *See supra* note 5; Doc. [58] at 13.

[7] Plaintiff admits these facts but argues that the Court should not consider them because his performance history is not relevant to the Court's analysis. Doc. [58] at 15-16. The Court disagrees. Plaintiff's performance history is plainly relevant to the Court's analysis of the parties' arguments, which focus on the reasons for Plaintiff's termination.

3

goal, and Pearo placed him on a collaborative coaching plan. *Id.* ¶ 29. On July 3, 2018, Pearo issued a verbal warning to Plaintiff, noting various aspects of his performance that needed improvement, including "maintaining professionalism with clients and employees and utiliz[ing] . . . team members to a greater extent to delegate responsibility." *Id.* ¶ 30; Doc. [58] at 19. In October 2018, Plaintiff received another verbal warning, this time focused not only on the need "demonstrate professionalism" at all times, but also on the need to "hold sufficient meetings" per week, "maintain a positive attitude," and reach EAG goals. *Id.* ¶ 31.[8]

Plaintiff's 2018 performance review indicated that he achieved only 67.9% of his EAG goal, and that his overall rating was "inconsistent."[9] *Id.* ¶ 35. The national EAG average for WMAs in 2018 was 98.7%, and the WMA EAG average for Ernst's region was 101.7%. Doc. [50-18] at 6. In his 2018 review, Plaintiff wrote that "this year has been exceptionally challenging from an asset growth perspective," and he could not "come up with a reasonable explanation." *Id.* ¶ 38. Pearo indicated in the review that Plaintiff needed to "make sure he has [a] full sense of urgency and continued growth mindset to focus on a must have fast start in 2019." *Id.* ¶ 39. In January 2019, Plaintiff received another verbal warning focused on the same issues addressed in the prior warnings. *Id.* ¶ 37. In April 2019, shortly before resigning from TIAA, Pearo recommended that Plaintiff receive a written warning, and Fowler decided to issue the warning. *Id.* ¶ 40. Byron Blaine replaced Pearo as Wealth Management Director in the St. Louis office and was present when the written warning was delivered to Ernst, but he was otherwise uninvolved in the warning process. *Id.*

The written warning indicated that Ernst was not "meet[ing] the minimum standards established for [Ernst's] role," that he had a slow start to 2019, that his asset growth metric was not improving, and that he had greater outflow of cash than inflow, with a negative net flow of over $2.7 million. *Id.* ¶ 41; Doc. [43-30] at 1. The warning also stated that the "perception of [Ernst's] brand is one of negativity and focused on grievances about [his] role," that Plaintiff focused on complaining about TIAA as an organization rather than case preparation or strategy sessions, and that he had made little progress in his efforts to deepen relationships with clients despite being instructed to reach out and engage with clients who were at risk of attrition. *Id.* ¶ 42; Doc. [43-30] at

---

[8] Plaintiff denies ¶¶ 30 and 31, but the Court deems the facts admitted, as Plaintiff does not cite evidence that controverts them, and the record plainly supports the assertion that the warnings were based on both quantitative and qualitative factors. Doc. [58] at 19-20.

[9] The 2018 WMA Rating Scale had five levels with the highest being "Exceptional," followed by "Exceeds," "Achieves," "Inconsistent," and the lowest, "Unacceptable." Doc. [50-18] at 7.

4

2. The warning further stated that this "serious situation" required Ernst's immediate attention, and that failure to meet the expectations and goals described would "lead to further disciplinary action up to and including termination of employment without further warning." *Id.* at 5.

Plaintiff acknowledges that he had a reputation for criticizing TIAA and asking difficult questions of management, and that management did not appear to appreciate his feedback. Doc. [43] ¶ 44. For example, Plaintiff testified that he believed that Regional Manager Fowler did not like him because of Plaintiff's practice of asking challenging questions. *See* Doc. [43-4] at 197:14-197:16. Fowler thought that Plaintiff's efforts to challenge management demonstrated inability to receive coaching, take personal responsibility, and work as a team. *See* Doc. [43] ¶¶ 44-45; *see also* Doc. [43-1] at 3. Fowler perceived that Plaintiff failed to understand the importance of qualitative metrics, such as positive mindset, coachability, and being responsive to clients, as demonstrated by a significant number of client complaints about Ernst. *Id.* ¶ 46; *see also* Doc. [43-7] at 10:18-25; 11:1-11:25; 12:1-12:14; 45:1-45:7; 46:8-46:24. Fowler frequently discussed Plaintiff's performance struggles with Plaintiff's direct supervisors, including his resistance to coaching, his difficulties connecting with clients, and client complaints. Doc. [43] ¶ 48.[10]

Prior to the 2019 2nd Quarter calibration meeting, Blaine (Pearo's replacement in the St. Louis office) submitted to Fowler feedback about his WMAs, including a recommendation that Plaintiff's written warning be extended, as Blaine had not yet had sufficient time to interact with and observe Ernst. *Id.* ¶ 49. At the national meeting, Fowler consulted with his peers about Plaintiff's performance issues and made the decision to terminate his employment.[11] *Id.* ¶ 51. Fowler based his decision on Plaintiff's ongoing performance issues, the number of client complaints, his negative outflow numbers, his lack of responsiveness to clients, missing business targets, coachability concerns, and past verbal and written warnings. *Id.* ¶ 52.[12] Blaine, as Plaintiff's direct supervisor, notified Ernst of the decision. *Id.* ¶ 53.

---

[10] Plaintiff objects to this statement, asserting that he believed that the "focus was always on the numbers" as opposed to any qualitative factors. Doc. [58] at 30. Ernst's personal opinion is insufficient to controvert an otherwise undisputed factual claim. *See Benford v. Grisham*, 2020 WL 569871, at *1-*3 (E.D. Mo. Feb. 20, 2020) (a plaintiff's speculation and personal opinions are not sufficient to defeat the defendant's motion for summary judgment); *see also supra* note 2.

[11] Plaintiff objects to the paragraph as irrelevant but does not controvert the information therein. Doc. [58] at 32. The identity of the decision-maker who determined to terminate Plaintiff is plainly relevant to this matter, as is the process he used.

[12] Plaintiff denies this statement, accusing Fowler of providing "a false narrative," but he points to no evidence that Fowler was lying, nor any other evidence controverting the testimony. Doc. [58] at 34-35.

After his termination, Ernst submitted a formal complaint to TIAA, alleging that Fowler retaliated against him for asking difficult questions of management. *Id.* ¶¶ 56-58. He did not mention any perceived discrimination against him based on age or sex during his employment. *Id.* No one in management at TIAA ever made any comments to Plaintiff about his age, and Plaintiff cannot identify any instances when Fowler said anything to him that Plaintiff thought was discriminatory. *Id.* ¶¶ 63, 67. All of Plaintiff's supervisors were males over the age of 40, and most of the WMAs who reported to Pearo, Fowler, and Blaine were also males over 40. *Id.* ¶¶ 61-66.[13] Another WMA, John Schless, was older than Plaintiff (born in 1954), reported to the same supervisors, and was also behind in some of his performance goals, yet management did not take adverse employment action against him. *Id.* ¶¶ 73-74. Yet another WMA, Jack Yale, was born in 1958, reported to Plaintiff's supervisors, and was removed from a warning rather than terminated. *Id.* ¶ 75. Additionally, some WMAs reporting to Fowler who were under the age of 40 received written warnings for failure to meet goals and were involuntarily discharged. *Id.* ¶¶ 76, 78. Blaine has recommended the termination of female employees, and Fowler has discharged female employees. *Id.* ¶ 79. Since 2018, Blaine and Fowler have hired multiple male WMAs over the age of 40, including at least one who was born in the 1950s. *Id.* ¶ 80.

After Ernst's termination, his position was not filled. *Id.* ¶ 83. His clients were distributed to existing WMAs in the St. Louis office. *Id.*[14]

On November 19, 2020, Ernst filed his First Amended Complaint, alleging one count of age and sex discrimination under the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. § 213.010 *et seq.*, one count of discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and one count of age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* Doc. [15].

---

[13] Plaintiff denies this statement, but the evidence he cites actually supports it. *See* Doc. [58] at 38. Plaintiff cites Plaintiff's Interrogatory No. 3, Doc. [50-3] at 2-5, which asks for the age of every WMA during the relevant period. Defendant's response lists 115 WMAs, 71 of whom were over the age of 40.

[14] Plaintiff disputes the facts alleged in ¶ 83, asserting that TIAA hired three new WMAs under Blaine, all women and all younger than Ernst: Brenda Bush, Andrea Paff, and Bridget Laughlan. Doc. [58] at 46-47. Those facts are not inconsistent with Ernst's own position not being filled and his workload being distributed to existing WMAs in the St. Louis office. Plus, the WMAs Ernst references were hired well before his termination, in Minnesota and Iowa (where Blaine also managed WMAs), not the St. Louis office, and, while all were younger than Ernst, one was born in 1956 and another in 1973. *See* Doc. [50-25] at 2-3.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, either party may move for summary judgment. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden to "bring up the fact that the record does not contain" a genuine dispute of material fact "and to identify that part of the record which bears out his assertion." *Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Assoc. Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988)). "[I]f the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court considers only those facts that are supported by admissible evidence, Fed. R. Civ. P. 56(c), and evidence that would not be admissible is ignored, *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003).

Where, as here, a plaintiff does not allege direct evidence of discrimination, the Court analyzes his claims under the familiar *McDonnell Douglas* burden-shifting framework.[15] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Starkey v. Amber Enters., Inc.*, 987 F.3d 758, 763 (8th Cir. 2021). Under that framework, Ernst must first establish a prima facie case of discrimination. *Cox v. First Nat'l Bank*, 792 F.3d 936, 938 (8th Cir. 2015). If he meets his burden, the burden shifts to TIAA to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 938-39. If TIAA provides such a reason, the burden returns to Ernst to produce evidence supporting an inference that the employer's rationale was mere pretext for intentional discrimination. *Id.* at 939.

---

[15] Claims of discrimination brought under Title VII, the MHRA, and the ADEA are generally subject to the *McDonnell Douglas* framework. *See Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 832 n.5 (8th Cir. 2020); *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 775-76 (8th Cir. 1995); *Bonenberger v. St. Louis Metro. Police Dep't*, 956 F. Supp. 2d 1059, 1065-66 (E.D. Mo. 2013); Mo. Rev. Stat. § 213.101.3. Therefore, the Court analyzes Plaintiff's state and federal claims together.

**DISCUSSION**

I. **The Court assumes Plaintiff has made his prima facie case.**

Ernst alleges that his termination was based on discrimination due to age and sex. To establish a prima facie case of discrimination on either of those bases under the MHRA, Title VII, or the ADEA,[16] Ernst must establish that (1) he is a member of a protected class; (2) he was qualified to perform his job; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination based on a protected factor. *See Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016). Although the "burden of establishing a prima facie case . . . is not onerous," the plaintiff must satisfy every element of his prima facie case, carrying at all times the "ultimate burden of proof and persuasion" to establish that the employer discriminated against him on an impermissible basis. *Id.* (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046-47 (8th Cir. 2010)); *see Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015) (noting that "the threshold of proof necessary to establish a prima facie case is minimal"). According to TIAA, Ernst fails to satisfy the second and fourth elements of his prima facie case because the record does not show that he was qualified for his job, nor does it support an inference of discrimination based on a protected factor.

TIAA argues that Ernst's documented failure to meet TIAA's legitimate expectations shows that he was not qualified to perform his job. Doc. [44] at 8. Ernst responds that TIAA is applying the wrong standard by requiring that he show that he was performing his job satisfactorily rather than that he was qualified for it. Doc. [52] at 3-4. On this point, the Court agrees with Ernst. "Under the qualification prong, a 'plaintiff must show only that he possesses the basic skills necessary for performance of the job,' not that he was doing it satisfactorily." *McGinnis v. Union P. R.R.*, 496 F.3d 868, 874 n.2 (8th Cir. 2007) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir. 2001)). "[W]here discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Id.* Ernst was employed as a WMA at TIAA for years prior to his termination, and he unquestionably possessed the requisite education and professional background for the position. Thus, the Court concludes that he has established the second element of his prima facie case. *See Arnold v. Nursing and Rehab. Ctr. at Good Shepherd, LLC*, 471 F.3d 843, 846 (8th Cir. 2006) (where nurse had served as a licensed practical

---

[16] "[T]he ADEA prohibits discrimination against employees, over the age of 40, because of their age." *Canning v. Creighton Univ.*, 995 F.3d 603, 610-11 (8th Cir. 2021), *cert. denied*, 211 L. Ed. 2d 364 (Dec. 6, 2021) (quoting *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 798 (8th Cir. 2014)).

nurse for nearly a year before her discharge, she was clearly qualified to serve in the position and need not also show that she was performing her job satisfactorily to make a prima facie case).

TIAA also argues that Ernst has failed to offer evidence that could give rise to an inference of discrimination based on a protected factor. Doc. [44] at 10. Ernst counters that he was treated differently than similarly situated employees, and that one of his supervisors made a derogatory comment about Ernst's "stamina."[17] Doc. [52] at 4-5. "The required prima facie showing is a 'flexible evidentiary standard,' and a plaintiff can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (quoting *Lewis v. Heartland Inns of Am., L.L.C.,* 591 F.3d 1033, 1039-40 (8th Cir. 2010)). The Court is mindful that "the burden of a prima facie case . . . is not onerous," because "[u]sing a more rigorous standard at the prima facie stage would 'conflate the prima facie case with the ultimate issue of discrimination,' thereby effectively eliminating the burden-shifting framework the Supreme Court has directed [courts] to use." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). It is a close call whether Plaintiff has met the low and flexible standard for the fourth element of a prima facie case under *McDonnell Douglas*, but the Court assumes that he has, since his case falters on McDonnell Douglas's pretext prong, regardless. *See Girten v. McRentals, Inc.*, 337 F.3d 979, 981 (8th Cir. 2003) (assuming a prima facie case was made where outcome turned on failure to establish pretext).

II. **Plaintiff has not shown that the proffered nondiscriminatory reason for his termination is pretextual.**

TIAA asserts that Ernst was terminated because of his documented history of both qualitative and quantitative performance deficiencies. Because that is a legitimate, nondiscriminatory reason for his termination, the burden shifts to Ernst to show that the "proffered justification is merely a pretext for discrimination." *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012). "[M]ore substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the defendant]'s legitimate, non-discriminatory explanation." *Quinonez-Castellanos v. Performance Contractors, Inc.*, 2017 WL 6519033, at *8 (N.D. Iowa 2017) (quoting

---

[17] Ernst also incorporates by reference all his arguments related to pretext, citing *Putnam v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003). *See* Doc. [52] at 4-5 ("[E]vidence of pretext—normally considered only at step three of the *McDonnell Douglas* analysis—satisfie[s] this aspect of the plaintiff's prima facie case burden.").

9

*Jones v. United Parcel Serv.*, 461 F.3d 982, 992 (8th Cir. 2006)). "Because the burden to prove pretext merges with the ultimate burden of persuading the court that the plaintiff was the victim of intentional discrimination, the plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021) (cleaned up).

"There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext." *Torgerson,* 643 F.3d at 1047. "A plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* (alterations in original) (citations omitted) (internal quotation marks omitted). A plaintiff might also show pretext by, for example, "offering evidence showing that the employer failed to follow applicable policies, treated similarly situated employees in disparate fashion, or shifted its explanation for the employment decision over time." *Schaffhauser v. United Parcel Serv.*, 794 F.3d 899, 904 (8th Cir. 2015) (citing *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)). Ernst claims that the following facts support a finding of pretext: (A) TIAA shifted its explanation for the termination decision after litigation ensued; (B) a former supervisor stated that Ernst lacked "stamina," which was an age-related slight; (C) TIAA treated similarly situated employees differently; and (D) TIAA failed to follow its own policies, which are impermissibly subjective. Doc. [52] at 5, 8. All four putative grounds for pretext fail.

### A. The record shows that TIAA has not changed its rationale for Ernst's termination.

Ernst claims that the only reason he was given for his discipline and eventual termination was his failure to meet quantitative performance metrics, and more specifically, the failure to reach his EAG goal. He says that it was only after litigation ensued that TIAA asserted that his termination was also based on qualitative concerns. Doc. [52] at 15-17. Ernst's account is contradicted by the record.

During his tenure at TIAA, Ernst insists, the only performance metric that mattered was reaching one's quantitative EAG goals, and at no time did TIAA value other, more qualitative, aspects of performance, such as positive attitude, customer satisfaction, or professionalism. His verbal warnings evinced "no qualitative concerns," he argues, but rather made "clear that the discipline was based upon one thing only, the external asset growth [or EAG]." Doc. [52] at 14-15. Ernst also claims that his written warning lacked any reference to qualitative issues. *Id.* at 15. Thus,

10

Ernst asserts, he was not terminated due to qualitative concerns, but because of his failure to meet his EAG goals. *Id.* And Ernst claims that TIAA's only evidence that he was terminated due in part to qualitative concerns is Fowler's deposition testimony. Doc. [50-12] at 23:15-28:14.

The record establishes that, while quantitative metrics provided some of the basis for Ernst's termination, qualitative considerations also played a role. All of Ernst's verbal warnings addressed not just his EAG results and other quantitative metrics but also qualitative issues, such as concerns about his professionalism, ability to delegate, and attitude. *See* Doc. [43] ¶¶ 30, 31; Doc. [58] at 19. His written warning also addressed numerous qualitative issues, including a two-page discussion entitled "Qualitative Performance and Mindset." Doc. [43-30] at 2-3. Ernst acknowledged as much at his deposition. *See* Doc. [43-4] at 38.

Ernst also claims that TIAA's "Management Memo for HR File Regarding Registered Rep Employee Termination," which describes why he was discharged, states only that he was discharged for "failure to meet certain internal performance metrics for position related to WMA role." Doc. [50-15] at 1-2. The memo does not help Ernst's case. To begin with, as a semantic matter, the phrase "internal performance metrics" does not imply that such metrics were exclusively quantitative. But the memo also decisively counters Ernst's narrative in a lengthy section titled "Description of Issues and Circumstances," which describes Ernst's history of performance deficiencies, including "qualitative factors" such as his failure to understand clients' goals and challenges, his lack of willingness to implement coaching he had received, and multiple client complaints. *Id.* at 2. The memo concludes that the "continued coaching and resources provided to [Ernst] have not produced significant and sustained improvement in [his] performance." *Id.*

"A change in the proffered reason for a termination may support a finding of pretext, but only if the employee gives 'two completely different explanations for their decisions to terminate.'" *Lichty v. Allina Health Sys.*, 2013 WL 4747552, at *5 (D. Minn. Sept. 4, 2013) (quoting *EEOC v. Trans State Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006)). The record here demonstrates that TIAA has always maintained that Ernst was disciplined and terminated for both qualitative and quantitative failures. Thus, Ernst has not shown that TIAA "shifted its explanation for the employment decision over time" sufficient to show pretext. *Schaffhauser*, 794 F.3d at 904.

### B.  A comment about Ernst's "stamina" provides no evidence of pretext.

On June 22, 2018, over a year before Ernst's termination, Chris Pearo, Ernst's then-supervisor, sent an email discussing whether Ernst would be able to reach his yearly goals, and noted that "Ernst [is] . . . going to be a big challenge," and "[he] has the pipeline to get there and beyond

11

just not sure he has the stamina." Doc. [50-1]. Ernst argues that this is a derogatory comment based on his age and creates an inference of discrimination. The Court disagrees.

"Not all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support such an inference. For example, 'stray remarks in the workplace,' 'statements by non-decisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself' will not suffice." *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426-27 (8th Cir. 1999) (quoting *Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir. 1991)).

Here, Pearo was no longer Ernst's supervisor when he was terminated, so he could not have been the decisionmaker.[18] "Stamina" is not synonymous with age, and nothing in the context of the message suggests that Pearo was alluding to Ernst's age. *See Ingram v. NWS, Inc.,* 1997 WL 688882, at *7 (N.D. Ill. Oct. 21, 1997) (general speculation as to whether employees may not have sufficient "stamina" "simply does not permit an inference of age discrimination"). And the statement was made so long before Ernst's termination that, even if it might otherwise raise an inference of discrimination, it is "outdated" enough to lack "probative value." *See Walton v. McDonnell Douglas Corp.,* 167 F.3d 423, 428 (8th Cir. 1999) (holding that stray remarks made almost two years prior to employment action were "outdated" and "lacking in apparent probative value."). The reference to "stamina" does not by itself evince any discriminatory animus, and Ernst has presented no evidence of a causal link between this "stray remark" and "the decisional process" leading to his termination. *Beshears*, 930 F.2d at 1354. Therefore, it provides no basis for an inference of discrimination.

### C. Ernst produces no evidence that TIAA treated similarly situated employees differently.

"At the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Bone v. G4S Youth Services, LLC,* 686 F.3d 948, 956 (8th Cir. 2012) (internal quotation marks omitted). A plaintiff "must show that [he] and the employees outside of [his] protected group were similarly situated in all relevant respects." *Id.* The potential comparators must "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.*

Ernst identifies as comparators nine WMAs who, like him, did not reach their EAG goals in 2018 and 2019, yet were not placed on written warnings or terminated. Doc. [52] at 21. He argues that it is "remarkable" that none of the comparators was similarly disciplined despite their similar

---

[18] According to the record, Fowler was the decisionmaker. Doc. [43] ¶ 51.

12

performance concerns. *Id.* But Ernst fails to show that any of the comparator WMAs was similarly situated to him in all relevant respects. He points to no evidence that the comparators had similar qualitative performance issues or disciplinary histories. In fact, he testified that he had no idea how other WMAs were evaluated qualitatively and was unaware of what his supervisors thought of anyone else's performance in that respect. *See* Doc. [43] ¶ 68; Doc. [43-4] at 190:5-190:12, 212:10-212:12. Additionally, one comparator offered by Ernst, Jack Yale, is a man only two years younger than Ernst. The suggestion that TIAA purportedly treated Yale better than Ernst despite similar performance issues runs counter to the claim that TIAA discriminated against older, male employees. *See Barber v. Am. Airlines, Inc.,* 791 F.2d 658, 660 (8th Cir. 1986) ("[N]o inference of age discrimination can be drawn, for the simple reason that the employees who were allegedly given preferential treatment were not 'young.' They were in the same age group as plaintiffs.").

### D. Ernst does not demonstrate that TIAA failed to follow its own policies.

Finally, Ernst claims that TIAA failed to follow its own disciplinary and termination policies, and that the process was subjective and unfair, which should give rise to an inference of pretext. He asserts that Fowler did not have adequate knowledge of Ernst's performance to make informed decisions about his employment;[19] that Blaine rarely interacted with Ernst and lacked meaningful knowledge of his performance that would allow him to make fair recommendations about Ernst's discipline; that TIAA did not have written disciplinary policies; that TIAA violated its policies by disciplining him even though he was not in the bottom 20% of all WMAs from a scorecard perspective; and that the disciplinary process was not based on a written policy, rendering it subjective and unfair. Doc. [52] at 9-14.

While "an employer's deviation from its own policies can, in some instances, provide evidence of pretext," *Russell v. TG Missouri Corp.*, 340 F.3d 735, 746 (8th Cir. 2003), the mere fact that corporate policies are not followed does not show that the employer's stated reason is subterfuge for discrimination. *See Schaffhauser*, 794 at 904 ("Although an employer's violation of its own policies may be indicative of pretext, that is not always so.") (quoting *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 522 (8th Cir. 2010)). "An employer can certainly choose how to run its

---

[19] Ernst notes that Fowler resided in Dallas, Texas, and visited each office he managed only once per year. Doc. [52] at 9. Ernst also states that Fowler had no "set practice" regarding how frequently he met with or spoke directly to his WMAs, and that Fowler never sat in on Ernst's client meetings or phone calls. *Id.* Ernst says that he met with Fowler only five times during his tenure at TIAA and had only one "one on one" meeting with Blaine while Blaine was his supervisor. *Id.* Ernst complains that this left his supervisors without meaningful personal knowledge of his performance. *Id.*

13

business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009) (internal quotation marks omitted). "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions," even if those decisions might seem unwise, unfair, or even incorrect. *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). "Even if the employer's acts are unfair, there has to be evidence connecting the unfairness to a discriminatory animus." *Schaffhauser*, 794 F.3d at 904. Ernst identifies no such evidence.

First, no evidence in the record establishes that TIAA had a policy of disciplining only WMAs in the bottom 20% of the scorecard.[20] Second, whether it was unwise or unfair that his supervisors made disciplinary decisions about him without having spent what Ernst considered adequate time interacting with him is immaterial. As the Eighth Circuit has repeatedly explained, "it is not [the court's] province" to decide whether an employer's actions were "wise, fair, or even correct," so long as the stated reason for the adverse action "truly was the reason for the plaintiff's termination." *Wilking*, 153 F.3d at 873. "Therefore . . . a plaintiff may not establish pretext simply by showing that the employer's 'honest' belief was erroneous, unwise, or even unfair. This is true regardless of whether the employer's explanation is based on first-hand knowledge or third-party reports." *Ozark Health, Inc.*, 959 F.3d at 325.

As for Ernst's complaints that there was no written disciplinary policy at TIAA, and that the lack of written guidance allowed management to make subjective decisions, that too fails to support an inference of pretext. There is no requirement that an employer must base employment decisions on a "formal written policy." *Collins v. Henderson*, 180 F.3d 988, 990 (8th Cir. 1999); *see also Palmer v. C. Freight Lines, Inc.*, 2013 WL 1760820, at *7 (E.D. Ark. Apr. 24, 2013) (personnel decisions need not be based on a formal written policy). Additionally, "[t]he presence of subjectivity in employee evaluations is *itself* not a grounds for challenging those evaluations as discriminatory." *Torgerson*, 643 F.3d at 1050. "[R]eliance on subjective criteria is not enough on its own to prove pretext," and in fact, a "supervisor's assessment of a particular employee's performance is necessarily subjective[.]"

---

[20] TIAA argues that Ernst misrepresents TIAA's disciplinary practices, as it has no such policy or practice. Doc. [57] at 8. Ernst cites to nothing in the record that supports the assertion that TIAA has a policy of disciplining only WMAs in the bottom 20% of the scorecard, and upon its own review of the evidence submitted, the Court found no supporting evidence for that assertion.

*Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 976 (8th Cir. 2012).  Thus, ultimately, it does not matter whether TIAA's policies led to employment decisions that were unfair, subjective, or misguided. What matters is whether the decision to terminate Ernst was motivated by discriminatory animus on the basis of either his age or his gender, and Ernst has not provided enough evidence for a reasonable factfinder to find that it was.

## CONCLUSION

Because Ernst has provided insufficient evidence for a reasonable factfinder to infer that TIAA's rationale for his termination is pretextual, TIAA is entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that TIAA's Motion for Summary Judgment, Doc. [42], is **GRANTED**.

A separate Order of Judgment will accompany this Memorandum and Order.

Dated this 20th day of January, 2023.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE